

DEPARTMENT OF VETERANS AFFAIRS
Veterans Health Administration
Washington DC 20420

AUG 2 2 2011

In Reply Refer To:

James Riano, RN
W319N1049 Balsam Lane
Delafield, WI 53018

SUBJECT: Disciplinary Appeals Board

Dear Mr. Riano:

    Your appeal to a Disciplinary Appeals Board regarding your discharge from the VA Medical Center in Milwaukee, WI was received on December 3, 2010. On December 14, 2010, a Disciplinary Appeals Board was appointed to consider your appeal and your request for a hearing before the Board.

    At the time of the discharge, you were a full-time permanent employee who had completed your probationary period. The action being appealed is a major adverse action. The charges, upon which the action is based, in whole or in part, involve issues of professional conduct and competence, and the appeal was timely filed. Therefore, I find the Board's jurisdictional determination was proper.

    The Board sustained the charges that you used inappropriate manual manipulation of male veterans' genitals and made unprofessional comments to veterans during examination or treatment. The Board concluded that the charge was sufficient to support the penalty of a discharge from federal service. After careful consideration of all of the evidence, including the Board's analysis and findings, it is my determination to execute the decision of the Disciplinary Appeals Board. A copy of the approved Board Action is enclosed. This is the final administrative action in this case.

Sincerely,

Robert L. Jesse, MD, PhD
Principal Deputy Under Secretary of Health

Enclosure

cc: Sally A. Stix, Appellant's Representative
    Medical Center Director

App. 101

| | |
|---|---|
| **Department of Veterans Affairs** | **BOARD ACTION** |

INSTRUCTIONS - Prepare one copy for Field Station and one copy for Central Office for all employees for whom Board Action is forwarded to Central Office for review or filing in Board Action Folder.

| 1. EMPLOYEE/APPLICANT'S NAME | 1A. EMPLOYEE'S POSITION |
|---|---|
| James Riano | Registered Nurse |

| 1B. EMPLOYEE'S GRADE AND STEP | 1C. NAME OF STATION |
|---|---|
| | Milwaukee, Wisconsin |

### INITIATING BOARD

| 2. NAME OF BOARD (Check one) | 3. STATION OF BOARD | 4. DATE |
|---|---|---|
| ○ PROF. STD. BOARD  ● DISCIPLINARY  ○ PHYSICAL STANDARDS | Milwaukee VAMC | |

**5. FINDINGS**

I. INTRODUCTION

In response to a complaint, later categorized as 4th degree sexual assault filed by a Veteran with the Milwaukee Police Department, an investigation was conducted by the Office of the Inspector General. The investigation included questionnaires and personal interviews from and with approximately twenty-three (23) Veteran patients. In response to the comprehensive report of investigation, a discharge from federal service was proposed on December 9, 2009. The appellant was charged with Inappropriate Manual Manipulation of Male Veterans' Genitals with nineteen (19) specifications attached to this charge. Appellant was additionally charged with Unprofessional Comments to Veterans during Examination or Treatment with fifteen (15) specifications attached to the charge. Written and oral responses were received on January 18, 2010, and January 26, 2010. The proposed removal was sustained by the medical center director, and the appellant was notified by letter on February 8, 2010, and the action effected on February 19, 2010.

On December 3, 2010, the Department of Veteran Affairs Office of Human Resources sent written confirmation that it had received an appeal to the VA's Disciplinary Appeals Board. An initial review of the documentation indicated that the appeal appeared to have been timely filed. Therefore, the appeal was accepted for processing and a DAB appointed. According to the paperwork, the appeal was sent to VACO in March 2010 but was lost until the appellant finally contacted the Office of Human Resources Management. Based on the date of filing and mailing, a constructed deadline of March 26, 2011 was established. On January 19, 2011, the appellant's representative submitted a request to extend the hearing date to March 22, 2011, and waived the 120-day time limitation as described in statute. A hearing commenced on March 22, 2011 at the Offices of Regional Counsel, Milwaukee VA Medical Center.

## II. JURISDICTION

a. Employee Status: The employee was a full-time permanent registered nurse appointed under 38 USC 7401 (1) and was subject to the completion of a 2-year probationary period commending on November 30, 2003, as evidenced in Exhibit B-3, SF50B, and Notification of Personnel Action.

b. Action being appealed: The action being appealed is a major adverse action and the charges in whole or in part involve professional conduct or competence (PCC) as there is a clear connection to direct patient care.

## III. FACTS AND ANALYSIS

The Board notes that all of the allegations were consistently denied by the appellant. The appellant's denial of each and every allegation and accusation was determined by the Board not to be credible. The statements made by the Veteran patients had a recurrent theme in regards to the appellant's conduct, and sometimes the description of events presented independently by numerous Veteran patients was almost identical. The Board considered it to be highly improbable that these witnesses collaborated to make false statements in regards to the appellant's treatment of them.

The appellant's attorney presented at the hearing that the Office of the Inspector General (OIG) investigation was flawed. (Transcript, Vol 1, page 132, lines 24 -25 page 133, lines 1-11, Vol II, Page 332, line 25, page 333, lines 1, and lines 14-23) The Board considered the appellant's attorney's assertion that the OIG investigation was unsound, but it concluded that there was no evidence to substantiate the appellant's claim. The Board considered that the OIG investigator used the statements that Mr. Riano made in his written response to the proposed discharge (Evidence File, Tab 10d, Attachment 3, pages 8-11) during the OIG investigation to formulate questions that were then asked of the Veterans. They were asked whether they believed Mr. Riano's statements to be true or false. In addition, the Board determined that there was no reason to question the investigator's competence in conducting the investigation, and there was no evidence of any bias on his part. The Board also considered it implausible that 19 patients would conjure up these allegations, which were markedly similar in many instances.

Additionally, the Board notes that Mr. Riano stated in his written response to the allegations, (EF, Tab 10d, Attachment 3, Page 8 of 38) "At no time did I ever tell a patient that they had to become erect in order for me to see better or to treat their lesions." However, throughout his testimony, Mr. Riano described use of the engorgement technique to increase blood flow to the shaft of the penis by applying pressure at the base of the patient's penis to entrap blood within the shaft which provides a firmer surface. (Transcript, Vol II, Page 276 lines 16 -19) When asked for what purpose this was done, the appellant testified, (Transcript, Vol II, Page 277, lines 2-4) "For me to be able to either identify and/or treat that particular area." When asked to explain the difference between engorging the penis with blood and an erection, the appellant responded in part, ". . . it would be a fuller erection. So that's why I tried to say engorgement, because it's not in a sexual context. It's in a medical context." The Board considered Mr. Riano's written response and sworn testimony to be contradictory and concluded that Mr. Riano was not a credible witness

**FACT:** Patients described the appellant's manipulation of their penis as being similar to masturbation

Mr. Riano stated in his written response he has never manipulated any penis in a "masturbatory way" (Evidence File, Tab 5, page 2).

However, many patients described the incidents using comparisons to masturbation or describing it as masturbation in either the own written complaints and/or interview statements. Such as, "masturbating me, (EF, Tab 10g, page 4 of 9, masturbate him into a full rigid erection, page 7 of 9; masturbate my penis with hand lotion, page 7 of 9)

Riano grabbed his penis with his hand containing Nivea cream, and began to stroke his penis in an up and down motion. Patient described Riano's grip and motion on his penis as being consistent with the grip and motion used for male masturbation. (EF, Tab 10j, and page 2 of 4).

Patient D-1 stated in Memorandum of Interview, asked him questions like, what are you going to be doing with your girlfriend? (EF, Tab 10k, attachment 9, page 4 of 4).

Patient M-2 stated in Memorandum of Interview that while Mr. Riano was manipulating his penis, to "think of that pretty girl in your geography class" (Evidence File, Tab 10w, pg 3 of 4)

**FACT -** Patients stated either in their own handwritten statements or to the OIG Investigator during their interview that they they were told by Mr. Riano he was following CDC Guidelines and/or Standard Procedures (SOPs) published by the CDC. (Evidence File, Tab 10g patient written statement, page 1 of 9 and page 3 of 9; and page 4 of 9, page 6 of 9) (Evidence File, Tab 10l, Attachment 5A page 1 of 9, page 6 or 9); Tab 10f, page 3 or 4 Patient H1) Mr. Riano presented in his oral reply, I follow the CDC guidelines and use this information to answer the patient's questions. (Evidence File Tab 5, Summary of Oral Reply, page 2) Mr. Riano testified, I followed the CDC guidelines for my clinic, which required treatment every one to two weeks. (Transcript, Vol II, page 289, lines 6-8) The Board reviewed CDC guidelines at http://www.cdc.gov/std/treatemnt/2006/genital-warts.htm.

The board notes the following statements of significance
- Treatment of genital wards should be guided by the preference of the patient, the available resources and the experience of the health care provider.
- Warts respond to various treatment modalities
- Majority of patients require a course of therapy rather than a single treatment
- In general warts located on moist surfaces or in intertriginous areas respond better to topical treatment.
- After visible genital warts have cleared, a follow-up evaluation might be helpful. A follow up evaluation may be useful 3 months after treatment.

The Board concluded that his statements regarding follow up required every one to two weeks is not stated in the guidelines; there are no standard procedures that could be located, but general

recommendations. (Exhibit B-10). Most significantly, neither the engorgement technique, nor a penis being erect in order to treat the illness is outlined in the Guidelines.

The Board notes that CDC Guidelines were never introduced or produced by Appellant at the hearing.

### CHARGE I: Inappropriate manual manipulation of male veterans' genitals.

During the summer of 2007, you were placed in charge of a special RN dermatology clinic that was established to meet the high demand for treatment of genital skin conditions. Several veterans have reported that you told them that it was necessary or preferable to have an enlarged, erect, or semi-erect penis to facilitate examination and treatment. It was consistently reported that you manually manipulated the veteran's penis in effort to gain an erection under this pretense. However, it is not necessary, preferred, or customary for the penis to be erect or semi-erect in order to be effectively examined and treated for genital skin conditions. Several veterans reported feeling discomfort, embarrassment, disgust, humiliation, or shame as a result of your treatment. Despite their misgivings, they allowed you to treat them in this manner because of your assurance that this was the standard practice. Your treatment of these veterans is not in accordance with accepted standards of medical practice, and constitutes inappropriate conduct. You are charged with inappropriate manual manipulation of male veterans' genitals. To wit:

> **Specification 1:** You saw veteran Mr. M1 for examination and treatment of genital warts for five visits in 2007. These visits took place on September 18 and 27, October 11 and 25, and on December 26. During each visit, you manually stroked the veteran's penis until it became erect, resulting in his ejaculation on two separate occasions. You sometimes applied lotion to his penis before stroking him. You told him that the lotion would help you to better see the lesions. You also told him that it was necessary that he become erect in order for you to be better able to see and treat his lesions, so he allowed you to treat him in this manner. The veteran stated that you continued to stroke him for some time beyond when he became erect, and that he had to actively resist ejaculating. The veteran reported that he was not comfortable with what you were doing, and that he felt disgusted and ashamed due to your treatment of him.

**Finding**s: Sustained

The appellant admitted in his written response that the patient made a statement to the effect, that "If you pull on that one more time, you're going to get something that you are not expecting." (Evidence File Tab 10d, Attachment 3, page 9 of 38; Testimony, Vol II., Page 319, lines 4-9).

The appellant denied "stroking" the patient's penis but he did not deny "pulling on his penis." (Vol II, Page 319, line 4-16) Appellant also testified he was examing the patient's penis when the patient stated this. (Transcript, Vol II, page 319, lines 22-24). When the appellant was asked "What did you change to when he told you, "If you keep doing that, something is going to happen." (Transcript, Vol II, Page 319-320, lines 25-4) he responded , "after about a 2-3 minute conversation -- I don't remember the exact location -- I may have then started concentrating on his scrotum." (Transcript, Vol II, Page 320, lines 2-4)  The appellant testified that the patient

ejaculated in the exam and agreed that the patient was embarrassed. (Transcript, Vol II, page 320, lines 9-13) The patient reported to the Milwaukee Police Detective that he felt disgusted and ashamed about what had happened. (Evidence file, Tab 10b, Milwaukee Police Report, page 5 of 13).

**The Board concludes that evidence exists to substantiate specification #1.**
**The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.**

> **Specification 2:** You initially saw veteran Mr. H1 for a clinic appointment on January 25, 2008, for genital warts. When you began to manipulate his penis, he asked you what you were doing. You told him that this would give him an erection, and that is was standard procedure from the CDC (Center for Disease Control). However, he did not become erect. A physician came and confirmed the presence of genital warts, and told you to remove them with liquid nitrogen. After she left the room, you continued massaging lotion on the veteran's limp penis. You squeezed the penis shaft and said, "I just can't get you hard." You then applied liquid nitrogen to the warts. The veteran reported that he felt embarrassed, humiliated and violated, and that he cried the entire time that he was driving home from Milwaukee to Green Bay. He reported that he became depressed and despondent, and had thoughts of suicide due to your treatment of him.
>
> Mr. H1 returned for a second appointment on February 15, 2008, and told you that everything was gone and that there was nothing to look at. You told him that you needed to check again, and you proceeded to massage his testicles and stroke his penis with lotion. The veteran repeated that all of the warts were gone, and told you to stop massaging him. You stopped and treated a few warts with liquid nitrogen. The veteran reported that he again cried and was extremely upset after the appointment, and has since had thoughts of suicide and of wanting to harm you. He reported that he was sexually assaulted and molested while in the Marines, and he now has nightmares of your sexually assaulting and molesting him.

**Findings**: Sustained.

Patient H1 reported to Special OIG Investigator during his interview that he had received treatment for the same condition for the last five years prior to his referral to Mr. Riano. He stated that the physician who treated him at the Appleton VA Clinic provided him with liquid medicine that he applied himself. (Evidence File, Tab 10f, page 1 of 4) The Veteran was referred to the Milwaukee clinic by his provider at the Appleton VA clinic. According to the investigator's documentation, the Veteran stated that the previous provider had only moved his penis and testicles enough to inspect his warts; there was no continuous manipulation of his genitals. (Evidence File, Tab 10f, Memorandum of Interview, page 4 of 4). The patient stated in his own handwritten statement that the appellant's behavior was rude and inappropriate (Evidence file, Tab 10g, page 1 and 2 of 9) and that Mr. Riano mentioned several times that what he was doing was standard procedure per the CDC (Evidence File, Tab 10g, and page 3 of 9 and again, page 4 of 9). The appellant never produced CDC guidelines during the hearing.

The Board reviewed CDC guidelines and found nothing in the current CDC guidelines to support Mr. Riano's statements related to his examination technique and treatment of genital warts.

6
Riano, James – Board Action (continuation)

The only finding remotely connected was the sentence which states, (Exhibit B-10, page 2, Regimens) In general, warts located on moist surfaces or in intertriginous areas respond better to topical treatment than do warts on drier surfaces.

**The Board concludes that evidence exists to substantiate specification #2.**
**The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven. The Board had no information to review regarding the information in the specification regarding the incident while in the Marines and the Veteran's comments regarding thoughts of suicide as portions of the statement and interview have been redacted.**

> **Specification 3:** You initially saw veteran Mr. G1 for a clinic appointment in approximately November 2007 for treatment of a genital wart. After a brief initial examination, a physician came in and advised that the wart should be treated with liquid nitrogen. After the physician left the room, you began to manipulate his testicles and stroke his penis, telling him that you needed his penis to get harder or bigger so that you could see if there were any small warts. When he failed to get an erection, you treated the wart with liquid nitrogen.
>
> The veteran's second and thirds appointments with you took place at approximately two week intervals after the previous appointment. During these appointments, you again examined and manipulated the veteran's testicles and stroked his penis, but the veteran failed to achieve an erection. You treated the wart with liquid nitrogen, and instructed the veteran to make another appointment in two weeks even if the wart was gone. The veteran reported that he did not make another appointment because he had been uncomfortable with your manipulation of his genitals, and that he found it very nerve racking, embarrassing, and humiliating.

**Finding:** Sustained.

The Board relied upon the handwritten statement of the patient in response to the OIG questionnaire, (EF, Tab 10h, page 1 of 2 and 2 of 2) and the summary of interview by the OIG investigator.

The Board noted that Mr. Coissart was not called as a witness, but the appellant's attorney impuned the integrity of the OIG investigator's inquiry. On multiple occasions, the appellant's attorney characterized the investigative report at double hearsay, biased and misleading. The Board does not find any evidence to substantiate the appellant's attorney's opinion that the OIG questionnaire is biased, misleading or double hearsay.

In response to the appellant's attorney contesting of the OIG questionnaire, the Board notes that the questionnaire has no open ended questions, it does not contain the appellant's name and the document states they are investigating allegations of inappropriate conduct by a member of the clinic's staff.

The Board noted that the patient's own handwritten response to the questionnaire states that he was embarrassed and humiliated, and as such, this is not an interpretation made by the OIG

App. 206

ano, James – Board Action (continuation)

investigator as characterized by the appellant's attorney. The investigator's report does mirror the patient's handwritten statements. The patient's handwritten statement states;"He would stroke my penis and said he needed to have it somewhat erect." The patient further states that Mr. Riano shared that another one of his patients leaked from his penis so much that is was much more than when he would ejaculate himself. (EF, Tab 10h, Attachment 6A, page 2 of 2).

**The Board concludes that evidence exists to substantiate specification #3.**
**The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.**

**Specification 4:** You initially saw veteran Mr. T1 for clinic appointments on February 4 and 19, 2008. These initial appointments each took approximately five minutes, during which you examined the veteran's genitals and treated his warts with liquid nitrogen. His third appointment with you was on March 3, 2008. During this appointment, you put Nivea lotion on your hands and then stroked his penis in an up and down motion consistent with the grip and motion used for male masturbation. The veteran reported that you told him that you needed to get his penis erect so that you could see any other warts that might be present. The veteran told you to just worry about the warts that could be seen, so you stopped stroking his penis and you treated the warts with liquid nitrogen.

The veteran's fourth appointment with you was on or about March 10, 2008. A female employee was present at this appointment, and the veteran reported that your examination and treatment during this appointment was of much shorter duration than any of the three previous appointments. The veteran reported that he believes that you sexually assaulted him during his third appointment with you.

**Findings:** Sustained.

The appellant denied "stroking consistent with the grip and motion used for male masturbation" in testimony. (Transcript, Vol II, page 276, lines 12 - 15). The Board notes that the appellant also responded "no" to the question," Did you ever stroke a patient's penis? (Transcript, Vol II, page 276, lines 6-7) The Board notes that the appellant did testify, I did apply Nivea cream to the shaft of the penis ... (Testimony, Vol II, page 264, line 19-20). The appellant testified (Testimony, Vol 11, page 271, lines 1-3) that he told his patients, "I would be pulling out on the penis." The Board concludes that appellant is mincing words and the Board does not know how one would apply cream to the penis (as testified) without using a stroking motion.

This patient does not have a handwritten statement; however, the Board relied upon the Memorandum of Interview as summarized by the OIG investigator. The Veteran and his attorney attended the interview with the OIG Investigator

The Board concludes that evidence exists to substantiate specification #4.
The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.

App. 207

**Specification 5:** Veteran Mr. D1 was initially referred to dermatology after a primary care appointment in the fall of 2007. He had approximately three appointments in dermatology with other providers for examination and treatment of warts on his hands. You saw him for his fourth appointment, and you examined and treated the warts on his hands in the same manner used by the other providers during his previous appointments. You then told him that you needed to check the rest of his body for warts. The veteran reported that he did not get the impression that this examination was optional, so he allowed the examination. You touched his genitals and told him that there were a few "trouble spots", so you would need to make his penis semi-erect by squeezing it to "cut off the blood and keep it in there." You then squeezed the shaft of his penis between your thumb and index finger for approximately two minutes, which did not result in it becoming semi-erect. You told the veteran to make an appointment in two to four weeks to follow-up on the trouble spots.

At the next appointment, you proceeded to examine the veteran's genitals in a much more aggressive manner. You squeezed his penis with increasing pressure while stroking it with the other hand, and you offered no explanation for your actions during this appointment. The veteran stated that he was trying to fight getting any degree of erection, but he became semi-erect. You told him that there was still one trouble spot that you wanted to treat with liquid nitrogen, but the veteran told you not to treat it. The veteran reported that he felt that you "had gone too far", and that nothing about this appointment felt professional or normal, other than the treatment of his hands.

**Findings:** Sustained.

The Board relied upon the Veteran's handwritten statement in response to the OIG investigator's questionnaire where he stated, "Jim told me he needed to make my genitals semi-hard to examine them. I took his word for it the first time 2 weeks or a month later I felt uncomfortable, especially when Jim told me, I have nice skin there, really smooth". (EF, Tab 10k, Attachment 9A, page 1 of 2) The appellant denies ever making the statement (Testimony, Vol II., page 280 lines 22-24).

The Board additionally relied on the summary of interview as outlined in the Memorandum of Interview by the OIG investigator. He wrote that the patient told him, "He immediately began his attempts to cause his penis to become erect by squeezing his penis again with ever increasing pressure and stroking his penis with his other hand." (EF, Tab 10k, Attachment 9, page 3 of 4)

This patient alleges he went to great lengths to try to find out if this was how a "genital exam" should be conducted by contacting the Dermatology Department at Columbia University, but he alleges that the physician would not discuss the patient's concerns. He allegedly attempted to complain by asked to speak to other VA physicians and could not obtain the information or even have success in receiving a return phone call. Move this to the summary as it relates to the trust the patients placed because they did not know how the exam actually should be done.

In determining this patient's credibility, the Board considered that another Veteran patient reported that Mr. Riano commented to him, "You have really nice skin.", (Testimony, Vol 11, page 283, lines, 17-21) Although the appellant denied making this comment about either patient,

App. 208

the Board considered the handwritten statement of this patient and another patient's handwritten statement (EF, Tab 10g, Attachment 5A) where he wrote, " He told me I had very good, healthy skin similar language, and the appellant denied all of the patient's allegations.

**The Board concludes that evidence exists to substantiate specification #5.**
**The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.**

> **Specification 6:** Veteran Mr. C1 was initially referred to dermatology after a primary care appointment in the fall of 2007. At his first dermatology appointment, a female staff member treated a genital wart with liquid nitrogen. You told the female staff member that you wanted to see the veteran after his treatment. You then met with the veteran and examined him. You began kneading and pulling on his penis, and you told him that you needed to "get the blood flowing down there" in order to see any other warts. Although your manipulation of his penis continued for several minutes, it did not become erect. The veteran reported that he was uncomfortable with what had occurred during the appointment.
>
> At the second appointment, you manipulated the veteran's penis using stroking motions, and you told him that you need him "to be like this" while making a gesture with your fist and forearm to graphically demonstrate an erection. The gesture involved making a fist and holding your forearm perpendicular to the floor, with a 90 degree angle from your upper arm. You continued to stroke and examine his penis until he became visibly distressed and angry, and then you stopped. You then treated his non-erect penis with liquid nitrogen. The veteran reported that he attended two more appointments with you, and each time you conducted the examination and treatment in a manner similar to that used in the second appointment. Each time you stroked his penis until he became distressed and angry, and each time you made the gesture and stated that it was necessary to make blood flow to the penis so that you could more easily see any additional warts. At the fourth appointment, the veteran stated that he expressed frustration that the liquid nitrogen treatment did not seem to be effective because the wart was still there. You told him that liquid nitrogen treatment was the best course of action, and that he would just have to continue coming back for follow-up appointments.
>
> After the fourth appointment, the veteran decided that he would no longer allow you to manipulate his penis in attempt to cause him an erection. The veteran reported that when he reported for his fifth, and final, appointment with you, he told you that you were not to touch his penis any more, and that he believed that there was no reason for it. Another provider was asked to examine the wart, and she recommended that it be surgically removed. The veteran was very angry that he had been repeatedly subjected to liquid nitrogen treatment and inappropriate manipulation of his penis when he should have had the wart surgically removed.

**Findings:** Sustained.
The Board relied upon the Memorandum of Interview summarized by the OIG investigator. (EF, Tab 10 L, pages 2 of 4) The investigator noted in his summary that the patient advised him that he did not return the OIG questionnaire because he lost the form. The OIG Investigator noted that the Veteran refers to Mr. Riano as kneading and pulling his penis, manipulating his penis and

that Mr. Riano stated, he needed to get the blood flowing down there. The appellant testified that his technique included pulling out on the penis (Transcript, Vol II, Page 271, lines 1-2). The appellant testified that his technique was to engorge the penis with blood. (Transcript, Vol II, Page 304, lines 22-24). The appellant stated in his written response regarding another Veteran (EF, Tab 10d, Attachment 3, page 18 of 38) that he did apply pressure to the base of the penis to retain the blood to create a firmer surface as I explained to him and **my other patients**. Another Veteran wrote in his handwritten OIG Questionnaire that "it wasn't like the staff member was simulating masturbation. It was done to get the blood flowing in your genital area. This Veteran did not feel violated, nor did that patient complain (EF, Tab 10m, Attachment 11A, page 1 and 2) The Appellant testified (Transcript, Vol II, Page 280 and 281, lines 25-2) "yes" to telling a patient to cover up a blister caused by the liquid nitrogen treatment because you hang. The OIG report mentions (EF,Tab 10 I, Attachment 10, Page 4 of 4) that Mr. Riano commented about his penis "hanging". The Board concludes the patient's comments as documented by the OIG Investigator are credible and the appellant has testified to using these terms and statements as noted.

The Board concludes that evidence exists to substantiate specification #6.
The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.

**Specification 7:** Veteran Mr. W1 was initially referred to dermatology after a primary care appointment in the fall of 2007. At his initial dermatology appointment, he saw another provider who treated him with liquid nitrogen for genital warts. You saw Mr. W. for three subsequent appointments. During these appointments, you told him that it would help to have more blood flow in the penis in order to find small warts that were hard to see, and that "it helps to be erect." During each appointment, you repeatedly gripped his penis and pulled it from the base to the head in attempt to make his penis erect.

**Findings:** Sustained.

The Board relied upon the Veterans handwritten statement on the OIG questionnaire. The patient reported that his genital area was manipulated to achieve "erection," but then he crossed out the word erection and replaced it with is statement and change it to "blood flow." The patient stated he did not feel violated and understood this to be in his best interest. Patient stated he did not see harm except to create a semi-uncomfortable situation. (EF, Tab 10m, Attachment 11A, page 1-2)

The appellant testified he would apply pressure to the base of the patient's penis (Testimony, Vol II, page 304, lines 9-11), and the technique was to engorge the penis with blood (Testimony, Vol II, page 304, lines 22-23).

The Board concludes that regardless of the patient reporting he did not feel violated; evidence exists to substantiate specification #7.
The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.

Riano, James – Board Action (continuation)

**Specification 8:** Veteran Mr. F1 was referred to dermatology for treatment of genital warts. During his first appointment with you, you gave him an unusually thorough examination, and then treated him with liquid nitrogen. The veteran cancelled his follow-up appointment because the warts were no longer visible. However, you called him several times in attempts to persuade him to return for a follow-up appointment. He stated that he agreed to a follow-up appointment to appease you after your repeated telephone calls.

During the second appointment you were more aggressive in your manipulation of his penis and testicles, but you found no areas needing treatment with liquid nitrogen. Despite this, you again called him to persuade him to come in for another follow-up appointment. Even though he saw no evidence of the warts returning, the veteran agreed to come in for another follow-up in approximately December 2007 or January 2008.

After a brief examination during his third appointment, you got out some Nivea cream and told the veteran that his penile skin was dry. You also told him that it was easier to see and examine his penis if it was semi or partially erect, and if it had more blood in it. You grabbed his penis at the base, with Nivea in your hand. With a full grip as is commonly associated with male masturbation, you repeatedly squeezed his penis at the base, and then stroked the penis up from the base to the head. You continued your manipulation and examination for several minutes, but did not find any areas to treat with liquid nitrogen. You told the veteran to make another follow-up appointment. When he did not, you continued to call him at home to persuade him to come in. The veteran reported that he felt that your manipulation of his penis was inappropriate and not necessary.

**Findings:** Sustained

The Board relied upon the handwritten statement of the Veteran in response to the OIG Questionnaire (EF, Tab 10n, Attachment 12A, page 1) and the Memorandum of Interview by the OIG investigator (EF, Tab 10N) The Veteran wrote, , "He explained that it was easier to see if there were any warts by having my genital somewhat erect. He got lotion and proceeded to grope and stroke at my shaft. At the time I found it rather odd, but never questioned because I thought it was standard procedure. Now I feel felt taken advantage of. (EF, Tab 10N, Attachment 12 A, page 1 of 1). When the appellant was asked, did you ever stroke a patient's penis, he testified, "no". (Transcript, Vol II, page 276, lines 6-7). The Board does not find the appellant to be a credible witness and finds the statements of the Veteran to be credible based on the similarity of handwritten statements of other Veterans.

The Board concludes that evidence exists to substantiate specification #8.
The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.

**Specification 9:** Veteran Mr. F2 had several appointments with you for examination and treatment of genital warts. During the first several appointments, you performed a thorough exam and treated his warts with liquid nitrogen. In later appointments, when the condition became less obvious and more difficult to see, your examination became more aggressive and intense. You told him that you needed his penis to have more blood flow so that it would be bigger and allow for easier examination and treatment. You repeatedly

manipulated his penis in a "masturbatory way" while you examined him and treated him with liquid nitrogen.

**Findings:** Sustained

The Board reviewed and relied upon the Veteran patient's type written statement (EF, Tab 10q, Attachment 15A, page 1) and Memorandum of Interview by the OIG investigator (Evidence File 10Q)
The Veteran patient wrote that Mr. Riano would have to attempt to stretch and otherwise manipulate the penis in an attempt to cause enough blood flow into the penis to exam. The Board identified that the quotation of "masturbatory way" came from the OIG report, which states Riano would use two fingers and his thumb to manipulate the penis in what the patient described as a "masturbatory way." The Veteran did not use this description in his handwritten statement. The Board has given credibility to the OIG report in that during the interview, the patient described the manipulation of his penis as described by the OIG investigator. The discrepancy is noted. Other patients noted in their handwritten statements very similar statements regarding blood flow and being erect or firm to make the examination would be easier (EF, Tab 10n, Attachment 12A and Tab 10n, Attachment 11A).

In addition, the patient informed the OIG investigator that he was contacted by Mr. Riano by phone. The Veteran reported to the OIG investigator that Mr. Riano if there was anything in his procedures that he felt was inappropriate and Mr. Riano told him that someone had complained that he had done something inappropriate. The Board notes that the patient is supportive of Mr. Riano and wrote that he does not believe Mr. Riano could have accomplished the medical objectives established without the used a "hands on approach" he took and does not know how he could have treated afflictions like this one on the penis shaft without in some way causing an increased blood flow to the penis. (EF, Tab 10Q, Attachment 15A, page 2 of 2) Therefore, while the patient stated, "No" to the question of his genitals having been manipulated, his written statement is evidence of inappropriate manipulation which the patient described in his own words.

The Board concludes that evidence exists to substantiate specification #9.
The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.

> **Specification 10:** Veteran Mr. D2 contacted the dermatology clinic in January 2008 when his genital warts had returned. During his first appointment with you, you aggressively examined his penis and testicles, and told him that you needed his penis to be erect to make it easier to see and treat his genital warts. You used a "full masturbatory grip" on his penis to "involuntarily stimulate him using a motion very similar to masturbation." You squeezed the entire shaft of his penis, and stroked it in an up and down motion. While doing so, you told him, "I understand this might seem a bit strange or different because I'm manipulating your genitals in this way, but I have to do it for me to examine and treat you effectively." The veteran stated that he had several follow-up appointments with you, all of which followed the same pattern of examination and treatment as in the initial appointment.

He reported that he was uncomfortable with your treatment of him, and that he found it strange, but he allowed it because you assured him that all patients were treated this way. The veteran reported that he had been treated by other providers at the VA and elsewhere for his genital warts, and none of the other providers had ever mentioned the need for his penis to be erect to examine and treat, and none manipulated his penis or moved it in a manner intended to cause an erection. The veteran stated that he is certain that your manipulation of his penis was not necessary or appropriate.

**Findings**: Sustained

Board reviewed (EF, Tab 10R) the evidence file and the OIG Questionnaire completed by the patient. The Board relied on the handwritten statement by the Veteran who wrote, "My genitals were made erect through manipulation by contact. Nivea cream was used as a lubricant. This was uncomfortable and strange, but I allowed it as I was advised that all patients were treated this way." (EF, Tab 10R, Attachment 16A, page 1).

Mr. Riano testified that he used the Nivea cream to provide a sheen that would help identify lesions (Transcript, Vol II, Page 264, lines 21-23) and/or for treatment of dry skin and to help with the comfort of healing after treatment (Transcript, Vol II., Page 270, lines 5-21) However, the patient only refers to use of cream for lubrication in connection to making him erect. Witness for the Appellant, Amber Christine Robbins, M.D., testified that the engorging method is not something she would standard do (Transcript, Vol II, page 297, lines 22). Dr. Robbins further testified that it was not necessarily a standard of care to apply pressure at the base of the penis to supply blood in the shaft (Transcript, Vol II, page 298, lines 21-25). Dr.Robbins testified that she was not aware of any procedure where a patient would need to be erect or hard or any kind of firmness in the penis for a genital wart examination. (Transcript, Vol II, page 299, lines 4-7). The Board concluded based on the testimony of the appellant's witness that the patient's statement as documented as told to the OIG Investigator the he was certain that Riano's manipulation of his penis was not necessary or appropriate. (EF, Tab 10r, Attachment 16, page 4 of 4).

The Board concludes that evidence exists to substantiate specification #10.
The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.

> **Specification 11:** Veteran Mr. C2 reported that he had approximately seven appointments with you during which you examined him and treated him with liquid nitrogen. At the last appointment, his condition appeared to have cleared up, but you told him that you would give him a "good check over". You told him that you were going to apply some cream to his penis and try to get him to "come up a little bit more". You told him that "I'm not trying to get you erect, just stimulated enough that I can see if there are any problem areas we can't see when your penis is normal size." You explained that you were going to manipulate his penis to get more blood to flow to it. You applied a clear gel to his penis, and then repeatedly squeezed the base of his penis and then stroked upward to the head.

App. 213

**Findings: Sustained**

The Board reviewed the Evidence File (EF, Tab 10S) and the OIG investigator questionnaire (Tab 10S, Attachment 17A, page 1 of 1) in which the patient indicated, "yes" that his genital area was manipulated. The patient wrote, "not in a way I felt it was inappropriate. During the interview with the OIG investigator, the investigator documented that the patient stated Mr. Riano stated he was going to apply a little cream on his penis and try to get him to come up a little bit more. He was going to manipulate his penis to get more blood flow to it. He told the patient, "I'm not trying to get your erect, just stimulated enough that I can see if there are any problem areas we can't see when your penis is normal size. Mr. Riano applied a clear gel, described as slippery and cold and used his index and middle fingers to squeeze the base of the penis and stroke upward and let go. The OIG Investigator documented during the interview that he read two sentences from Mr. Riano's written response, "At no time did I stroke a patient's penis until it became erect. At no time did I ever tell a patient that they had to become erect in order for me to see better or treat their lesions. The Veteran patient was very adamant that he viewed the statements to be truthful and he wanted the memorandum of interview to convey his support for Mr. Riano. (EF, Tab 10s, Attachment 17, page 3 of 3). The Board concludes that although this patient supports Mr. Riano's procedure and "does not feel anyway threatened or molested, the patient does document that the manipulation occurred.

The Board concludes that evidence exists to substantiate specification #11.
The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.

**Specification 12:** Veteran Mr. C3 was referred to the dermatology clinic for treatment of genital warts. During his first several appointments with you, you briefly examined him and then treated his warts with liquid nitrogen. He reported that during the last appointment, you told him that you needed to make sure that all of his warts were gone. You then manipulated his penis by wrapping your thumb and finger around the base of the shaft, and then repeatedly stroked it from bottom to top, and back down. Nothing was found that required further treatment. Despite this, you called him and attempted to persuade him to make another appointment. He reported that he declined to do so due to his distrust of you.

**Findings:** Sustained

The Board reviewed the evidence file at (EF, Tab 10T). The patient responded "yes" on his handwritten response to the OIG questionnaire (EF, Tab 10T, Attachment A, Page 1 of 1) that a staff member told him your genitals needed to be erect and "yes" that a staff member manipulated his genitals or perform any actions or procedures to make your genitals erect during examination and stated Dr. Jim said he needed to examine the bumps up close, Even I knew they were hair follicles!"

The OIG Investigator documented during the interview that he read two sentences from Mr. Riano's written response, "At no time did I stroke a patient's penis until it became erect. At no time did I ever tell a patient that they had to become erect in order for me to see better or treat

their lesions. The patient responded that he believes these statements are false. (EF, Tab 10t, Attachment 18, page 3 of 3)

The Board concludes the statements of the patient are credible as the appellant testified to use of the engorgement technique; the pulling out of the penis; to and creating more blood flow to the penis to examine and treat the patient (Transcript, Vol II, page 304, lines 22-24, page 270, lines 23-25, page 271, lines 1-2). The board concludes that the OIG Investigator's documentation that the patient stated Mr. Riano called him to persuade him to make another appointment is credible because the appellant testified that he did give patients his personal phone number and the appellant stressed the importance of follow up visits per the CDC guidelines as his testimony reflects. (Transcript, Vol II, page 289, lines 4-16. The Board concludes that the allegation of the patient that attempts to persuade the patient to return to the clinic is a credible

The Board concludes that evidence exists to substantiate specification #12.
The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.

> **Specification 13:** Veteran Mr. W2 was previously treated for several years by other providers at the VA and elsewhere for genital molluscum. He reported that none of these providers ever mentioned any need for him to have an erection, increased blood flow, or for his penis to be bigger to facilitate examination or treatment. He had not recently received treatment at the VA, so you called to make him aware of the new special clinic for treatment of genital warts. The veteran made an appointment approximately one week later since he had noticed two or three warts remaining on his penis. During the appointment, you examined him for approximately five minutes, and then began pulling, squeezing, and kneading his penis. You explained that you were manipulating his penis because you needed to make more blood flow in order to make it larger so that you could better see the difference between warts and hair follicles. You squeezed the shaft of his penis with two fingers and your thumb of one hand, and repeatedly pulled it from the base to the head in a deliberate manner. The veteran reported that he was not comfortable with this, but decided to get it over with since he had traveled some distance for the appointment.

**Findings**: Sustained

The Board reviewed the Evidence File (EF, Tab 10U) The Board relied on the Veterans handwritten response to the OIG questionnaire (EF, Tab 10U, Attachment 19A, Page 1 of 1) The patient wrote, "yes" to being told his genitals needed to be erect and "yes" to a staff member performing actions to make your genitals erect. The Veteran wrote, "I trusted judgment" and stated, "I think he owed me a dinner." Patient states he was contacted 4-5 times after the appointment wondering when he would be making another appointment, and the patient stated that had never happened before. Patient stated that "All in all it was a very embarrassing experience and is contemplating contacting a lawyer."

The OIG investigator, documents (EF, Tab 10U, Attachment 19, page 2 of 4 and 3 of 4) that the patient stated, "Riano began grabbing his penis and pulling on it as if he was trying to squeeze the last of the toothpaste out. He was pulling and kneading the penis, at first offering no explanation for his actions. Riano then stated to him that he was manipulating the penis to create

16
Riano, James – Board Action (continuation)

more blood flow to his penis to make the penis larger and continued to do so, rubbing the head with his finger and thumb."

The patient reported to the OIG investigator that Mr. Riano told the patient he would now have to report his name to the CDC and this patient states he does not want to return to the VA.

When the Investigator read the patient's two statements to Mr. Riano, he indicated in his written response, "At no time did I stroke a patient's penis until it became erect. At no time did I ever tell a patient that they had to become erect in order for me to see better or treat their lesions; The patient said, the quote was absolutely false; he may not have used the term "erection", but that was what he did". The Board concludes the statements of the patient are credible as the appellant testified to use of the engorgement technique; the pulling out of the penis; to and creating more blood flow to the penis to examine and treat the patient (Transcript, Vol II, page 304, lines 22-24, page 270, lines 23-25, page 271, lines 1-2). The Board concludes that the OIG Investigator's documentation that the patient stated Mr. Riano called him to persuade him to make another appointment is credible because the appellant testified that he did give patients his personal phone number and the appellant stressed the importance of follow up visits per the CDC guidelines as his testimony reflects. (Transcript, Vol II, page 289, lines 4-16. The Board concludes that the allegation of the patient that attempts to persuade the patient to return to the clinic is a credible

The Board concludes that evidence exists to substantiate specification #13.
The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.

> **Specification 14:** Veteran Mr. P was referred to the dermatology clinic for examination and treatment of a wart on his penis. At his initial appointment, you examined him briefly and then told him that you would need to get his penis erect in order to treat it with liquid nitrogen. You told him that getting his penis erect would result in a lesser number of follow-up treatments because the liquid nitrogen would reach more of the wart. You squeezed the base of his penis, and told him to think of something to make him hard. You suggested that he think about a girl he wanted to have sex with or fantasized about. The veteran returned for two more appointments with you, each about a week apart. These appointments were similar to the first appointment, and you manipulated his penis in the same manner.

**Findings**: Sustained.

The Board reviewed the evidence file (EF, Tab 10V) In the patient's handwritten response to the OIG questionnaire, (EF, Tab 10V, Attachment 20A, Page 1 of 1) he answers yes to both questions that a staff member stated his genitals needed to be erect and "yes" performed actions to make your genitals erect during examination. The patient writes "he held my penis at the base and asks to think of something to make me erect so he could use the nitrogen to remove the wart".

During the interview with the OIG Investigator, the investigator summarized (EF, Tab 10V, Attachment 20 page 2 of 3) that the patient stated Mr. Riano told the patient he needed to get the penis erect so he could get to the wart to spray it with liquid nitrogen . In response to the

Riano, James – Board Action (continuation)

Investigator quoting from Mr. Riano's written response, the patient stated the first sentence truthful, (At no time during any examination did I stroke a patient's penis until it became erect.) However, the patient stated the second sentence, (At no time did I tell a patient they had to become erect in order to for me to see better or treat their lesions.) was a lie. He reiterated that Riano specifically told him that having an erection would reduce the number of shots of liquid nitrogen to treat his wart.

The patient reported to the OIG investigator who documented in the Memorandum of Interview that Mr. Riano told him to think about a girl he wanted to have sex with or fantasized about (EF, Tab 10V, Attachment 20, page 2of 3). The Appellant denies this statement, in testimony (Transcript, Vol II, page 277, lines 8-11 as well as denying a similar allegation by a patient (Transcript, Vol II, page 284, lines 22-25). The Board concludes that the patient's statements are credible based on the similarity of two different patients making the same allegation. In addition, Mr. Riano testified that he would apply pressure to the base of the patient's penis (Transcript, Vol II, page 304, line 8)
The Board concludes that evidence exists to substantiate specification #14.
The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.

> **Specification 15:** Veteran Mr. M2 saw you for a dermatology appointment for a plantar's wart on his foot and a wart on his hand. You asked him if he "had anything abnormal going on in the genital area." The veteran had previously been treated for molluscum, and had a spot that he wanted checked. You briefly examined him and identified molluscum on his penis and a wart on the bottom of his testicles. You told him that you were going to apply Nivea cream to help enhance the lesions, and that you were going to manipulate his penis to get blood to flow to make his penis bigger. You applied the Nivea, rubbing lengthwise on his penis. You then used your thumb and fingers to stroke the shaft of his penis in an up and down motion. You told him not to ejaculate for one week prior to his appointments so that it would be easier for him to "get an erection", making it easier for you to see lesions. The Veteran had approximately six to eight follow-up appointments with you, and you manipulated his penis in the same manner and duration at each appointment.

**Findings:** Sustained

The Board reviewed and relied upon the Veterans handwritten statement and response to the OIG Questionnaire (EF, Tab 10w, Attachment 21B, pages 1-2) The patient wrote "yes" to a staff member telling you your genitals needed to be erect in order to be examined, and added, with my consent and assumption that the examination is legitimate. The Veteran wrote "yes" to a staff member performing any action to make genitals erect during examination or treatment and further stated, I was told that the procedure of manipulation of my genitals was legitimate and a normal procedure to make my genital erect to examine the areas for any "raised bumps" which will be able to locate/see better. The staff member would wear latex gloves and use lotion to manipulate the genitals. At first I was "weirded" out but didn't believe the staff member has unlawful intentions. The first few times the procedure was performed, the goal of achieving erection was not met and I was asked to hold off on performing self-masturbation for a week before to achieve a more enhanced erection or better blood flow to the area. After 5 times of this

and every time leading up to that point, I did inform the staff member that the situation and environment would prevent me from achieving an erection, which the staff member agreed.

The Board notes the discrepancy in the patient's handwritten statement in April, 2008 and the June 2008, signed affidavit however, the affidavit states at lines 14 and 15 "As Jim was doing the exam, he explained it was easier for him to see any lesions and to administer any nitrogen treatment if my penis was firm. At line 15, "He applied pressure to make it firmer" Line 16 states, Jim did <u>not manually stroke</u> my penis until it became erect. Jim never continued to stroke my penis beyond what was necessary to treat me.

In October, 2008 the Veteran patient agreed to an interview with the OIG Special Investigator. The statements statements documented by the Investigator as stated by the patient are consistent with his original written response to the questionnaire. He stated his methods were odd but did not feel violated at the time because he was a trusted medical professional. The patient told the Special Investigator that he was contacted by Mr., Riano who told him he was being investigated for his methods but reassured the patient by telling him he had been treating patients in the same manner for 20 years with no problems, so the he agreed to allow Riano's attorney contact him, which she did and asked several questions over the phone and then sent the affidavit which he took to the bank to have it notarized. This is consistent with his written statement. The Board deems the statements in the written statement of the Veteran to be credible. The Board concluded that the statement of the patient on both the OIG Special Investigation questionnaire (April 9, 2008) and the statements on the Affidavit (June 17, 2008) to be true. The Affidavit consisting of 23 statements was prepared by the appellant's attorney following a telephone conversation he agreed to participate in and respond to questions. In addition, statements documented by the Special Investigator from the face to face interview (October 22, 2008) mirror the statements the veteran made in his own handwriting.

The Board concludes that evidence exists to substantiate specification #15.
The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.

**Specification 16:** Veteran Mr. T2 began coming to the Milwaukee VAMC in approximately October 2003 for treatment of genital warts. During his appointment with you, you applied a lubricant to his penis and then began squeezing and stroking it. He reported that you repeatedly stroked up and down using "way too much contact". You told him that, "I'm just doing this so I can see them all." The veteran reported that he had achieved a full erection and tried to hold back and not ejaculate. At the end of the exam you treated his warts with liquid nitrogen. The veteran reported that he didn't feel right about what you were doing, and didn't think that you were acting appropriately. He reported that he did not attend a scheduled follow-up appointment because of what had occurred during the first appointment. You called two or three times and left messages trying to get him to schedule another appointment, but he did not do so. He reported that since his appointment with you, he suffers from sexual performance dysfunction, which he attributes it to your abuse of him since he did not previously suffer from this condition.

**Findings:** Sustained

Riano, James – Board Action (continuation)

The Board relied upon the statements as documented by the OIG special investigator. The patient did not return the questionnaire. He initiated a phone call to the special investigator and he agreed to a face to face interview. The investigator stated the patient stated, yes, he did believe James Riano inappropriately manipulated his genitals during his examination and treatment. During the face to face interview, the investigator read the two quotes from his written response ot the proposed discharge "At no time did I stroke a patient's penis until it became erect. At no time did I ever tell a patient that they had to become erect in order for me to see better or treat their lesions;to which the investigator noted the patient was shocked and emphatically expressed his belief that the statement was not true. Mr. Riano testified that he would apply pressure to the base of the patient's penis (Transcript, Vol II, page 304, line 8) and this is consistent to what the patient reported to the investigator.

The Board concludes that evidence exists to substantiate specification #16.
The Board concludes that Charge 1 of inappropriate manual manipulation of male veterans' genitals is proven in its entirety.

> **Specification 17:** Veteran Mr. H2 was treated in the dermatology clinic for facial acne. You told him about the existence of a special clinic for the treatment of genital warts, and asked him if he wanted to be examined. He agreed because he had noticed some small spots on his penis that had been there a long time. At his first appointment with you, you told him that he had to get his penis somewhat enlarged, or that the blood flow had to be increased, so that you could treat the areas better. You used Nivea cream, and then pinched the base of his penis with one hand and then repeatedly stroked his penis from the base to the head. The veteran had four or five follow-up treatments during which you manipulated his penis and treated his genital warts in a manner similar in method and duration to that used in the first appointment.

**Findings**: Sustained

The Board relied upon the affidavit the appllent's attorney prepared and that the patient signed after agreeing to a phone interview and the Memorandum of Interview prepared by the OIG special investigator (EF, Tab 10y, Attachment 23) The affidavit statements on item (EF, Tabe 10y, Attachment 23A , page 2 of 3). 13 which states, As Jim was doing the exam he explained it was easier for him to see any lesions and to administer nitrogen, the treatment for genital warts, if my penis was firm. Statement 14 reads, He applied pressure to make it firmer. Line 17 reads, Jim never continued to "stroke" or manipulate my penis beyond what was necessary for him to treat me or find the warts. Line 19, Jim applied lotion, ….. The Board concludes that although the patient submitted an affidavit stating he was never uncomfortable with Jim's treatments (statement 21 Attachment 23A, page 3 of 3) that the manipulation as described and submitted by the patient to the appellant's attorney describes inappropriate manipulation of male genitals. The Board found no evidence that stroking the penis is part of any treatment or examination technique for genital warts. The Board notes the discrepancy where Mr. Raino was asked did you ever stroke a penis and he responded no, (Transcript, Vol II, page 276, lines 6-7). The same attorney prepared affidavits of the questions she asked the patient putting the emphasis on "continuing" to stroke or manipulate the penis beyond what was necessary for treatment. During the face to face interview the patient agreed to participate in, the OIG special investigator noted